# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*<br>CHRISTOPHER BERLIN<br>710 N. Pelham Street,<br>Alexandria, Virginia 22304<br><br>       Plaintiff-Relator,<br><br>BRINGING THIS ACTION ON BEHALF<br>OF THE UNITED STATES OF AMERICA<br><br>c/o<br><br>UNITED STATES ATTORNEY<br>FOR THE DISTRICT OF MARYLAND<br>36 South Charles Street<br>Baltimore, MD 21201<br><br>ATTORNEY GENERAL OF<br>THE UNITED STATES<br>U.S. Department of Justice<br>950 Constitution Avenue, N.W.<br>Washington, DC 20530<br><br>v.<br><br>GBS HOLDINGS, LLC<br>251 18th Street<br>Arlington, VA, 22202<br><br>GBS HEALTH, LLC<br>251 18th Street<br>Arlington, VA, 22202<br><br>OB-GYN ASSOCIATES<br>1400 Forest Glen Road, Suite 500,<br>Silver Spring, MD 20910<br><br>MARYLAND PHYSICIANS EDGE, P.C.<br>1400 Forest Glen Road, Suite 400<br>Silver Spring, MD 20910 | No._____<br><br><br>**COMPLAINT<br>AND JURY DEMAND**<br><br>**FILED UNDER SEAL**<br>PURSUANT TO<br>31 U.S.C. § 3730(b)(2)<br><br><br>DO NOT PUBLISH |

ADVANTIA HEALTH                              )
1400 Forest Glen Road, Suite 500             )
Silver Spring, MD 20910                      )
                                             )
ADVANTIA GERMANTOWN OB/GYN, LLC              )
351 West Camden Street,                      )
Baltimore, MD 21201                          )
                                             )
ADVANTIA HOLDINGS OF                         )
MARYLAND, LLC                                )
12240 Indian Creek Court, 130                )
Beltsville, MD 20705                         )
                                             )
ADVANTIA HEALTH SPINE-SPORTS                 )
& PAIN CENTER OF MARYLAND, LLC               )
12240 Indian Creek Court, Suite 130          )
Beltsville, MD 20705                         )
                                             )
ADVANTIA HEALTH SPINE-SPORTS                 )
& PAIN CENTER                                )
12240 Indian Creek Court, Suite 130A         )
Beltsville, MD 20705                         )
                                             )
ADVANTIA SURGICAL, LLC                       )
12240 Indian Creek Court, Suite 130          )
Beltsville, MD 20705                         )
                                             )
ADVANTIA HEALTH INDIAN CREEK ASC             )
12240 Indian Creek Court, Suite 130          )
Beltsville, MD 20705                         )
                                             )
NATOL SOLUTIONS, LLC                         )
9841 Avenal Farm Drive                       )
Potomac, MD 20845                            )
                                             )
DR. NANCY BEHRAM                             )
1400 Forest Glen Road                        )
Silver Spring, MD 20910                      )
                                             )
DR. PETER GLASS                              )
251 18th Street                              )
Arlington, VA, 22202                         )
                                             )
SEAN GLASS                                   )
251 18th Street                              )
Arlington, VA, 22202                         )

|  |  |
|---|---|
| Dr. RON JACOBS<br>2010 Medical Park Drive, #201<br>Silver Spring, MD 20902 | )<br>)<br>)<br>) |
| DR. BRADFORD KLEINMAN<br>1400 Forest Glen Road<br>Silver Spring, MD 20910 | )<br>)<br>)<br>)<br>) |
| DR. CAROLYYN MORALES<br>1400 Forest Glen Road<br>Silver Spring, MD 20910 | )<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

1.     This is an action filed under the *qui tam* provisions of the False Claims Act 31 U.S.C. §§ 3729, *et seq*., by Plaintiff-Relator Christopher Berlin on behalf of the United States, and himself to recover penalties and damages arising from illegal activities related to money owed to government health care programs.

2.     The Plaintiff-Relator provides details regarding violations of the Stark Law self-referral prohibitions, illegal up-coding of claims, lack of documentation of medical necessity and other violations involving illegal charges to government medical and health insurance programs.

## I.     JURISDICTION AND VENUE

3.     The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

4.     This action arises under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq.*

5.     This Court maintains subject matter jurisdiction over this action pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331.

6.     Venue is proper in this Court pursuant to 31 U.S.C. § 3732(a) because the Defendants regularly transact business in this District, and did so at all times relevant to this

Complaint. Several Defendants also maintain offices within this jurisdiction including those at 1400 Forest Glenn Road, Silver Spring, MD 20910. Furthermore, the False Claims Act confers national jurisdiction.

## II.   PARTIES

### A. Plaintiff-Relator

7.    The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

8.    Plaintiff-Relator Christopher Berlin, 710 N. Pelham Street, Alexandria, Virginia 22304, is a financial professional with extensive experience in investment banking and analysis. Mr. Berlin initially served as Vice President of Strategy and Finance for GBS Health, LLC until he determined that he could no longer participate in the company's practices detailed below. He left the company and renounced his interest in it in November of 2014.

9.    This suit is not based upon prior public disclosures found within sources of allegations or transactions that are encompassed by the definition of the term "publicly disclosed" under 31 U.S.C. § 3730(e)(4)(A).

10.   To the extent that a public disclosure has occurred, Mr. Berlin qualifies as an original source under the False Claims Act.

### B.  Defendants

11.   Defendant GBS Holdings, LLC ("GBS Holdings"), 251 18th Street Arlington, VA 22202, is a sole proprietorship. This company is a limited liability company primarily owned by Dr. Peter Glass and Sean Glass. Through its wholly owned subsidiary GBS Health, LLC

the company bought all the non-medical assets of the former OB-GYN Associates, and OB-GYN Associates, P.A.

12.     Defendant GBS Health, LLC ("GBS Health"), 251 18th Street Arlington, VA 22202, is a wholly owned subsidiary of GBS Holdings, LLC. GBS Health was designed and formed to be a management company so that the investors could reap the financial incentives directly generated by a medical practice as a corporation; without this structure they would have been prohibited from such an ownership. Where appropriate herein, when both GBS Holdings and GBS Health act in concert they are referred to collectively as "GBS."

13.     Defendant OB-GYN Associates is now a division of Advantia Health with locations at 1400 Forest Glen Road, Suite 500, Silver Spring, MD 20910; 9715 Medical Center Drive, Suite 530, Rockville, MD 20850; and 7350 Van Dusen Road, Suite 220, Laurel, MD 20707. The Maryland Department of Assessments and Taxation lists OB-GYN Associates as being owned by OB-GYN Associates, PA, but also lists OB-GYN Associates, PA as having been dissolved. Collectively OB-GYN Associates and OB-GYN Associates, PA are referred to as "OB-GYN Associates." OB-GYN Associates and Advantia Health publish a website at http://www.obgynsilverspring.com

14.     GBS also owns or controls several related entities including, but not limited to, the following eight defendants who are collectively referred to as "Advantia," and are separately listed:

        Maryland Physicians Edge, P.C.,

        Advantia Health,

        Advantia Germantown OB/GYN, LLC,

Advantia Holdings of Maryland, LLC,

Advantia Health Spine-Sports & Pain Center of Maryland, LLC,

Advantia Health Spine-Sports & Pain Center,

Advantia Surgical, LLC,

Advantia Health Indian Creek ASC.

15. The Advantia organization operates several clinics, an ambulatory surgical center, and now includes the operations of Defendant OB-GYN Associates.

16. Defendant Maryland Physicians Edge, P.C., 1400 Forest Glen Road, Suite 400, Silver Spring, MD 20910, does business as Advantia Health. It bought all of the medical assets of OB-GYN Associates with funds from GBS Holding via GBS Health. According to its articles of incorporation, Maryland Physicians Edge, P.C. is owned by Dr. Peter Glass. It is listed by the Maryland Department of Assessments and Taxation as the owner of Advantia Health and Advantia Health Spine-Sports & Pain Center. Maryland Physicians Edge, P.C., also maintains a laboratory on the premises at 1400 Forest Glen Road, Suite 500, Silver Spring, Maryland 20910.

17. Defendant Advantia Health, 1400 Forest Glenn Road, Suite 500, Silver Spring, MD 20910, is listed by the Maryland Department of Assessments and Taxation as being owned by Maryland Physicians Edge, P.C.  It is the public entity on websites for Maryland Physician's Edge, P.C.

18. Defendant Advantia Germantown OB/GYN, LLC, 351 West Camden Street, Baltimore, MD 21201, is a medical practice.

19.    Defendant Advantia Holdings of Maryland, LLC, 12240 Indian Creek Court, Suite 130, Beltsville, MD 20705, is a holding company related to the other Advantia and GBS Defendants.

20.    Defendant Advantia Health Spine-Sports & Pain Center, LLC, 12240 Indian Creek Court, Suite 130, Beltsville, Maryland is a medical practice for pain management.

21.    Defendant Advantia Health Spine-Sports & Pain Center, 12240 Indian Creek Court, Suite 130A, Beltsville, Maryland, is a medical practice for pain management and is listed by the Maryland Department of Assessments and Taxation as being owned by Maryland Physicians Edge, PC.

22.    Defendant Advantia Surgical, LLC, 12240 Indian Creek Court, Suite 130, Beltsville, MD 20705, is a holding company for an ambulatory surgical center.

23.    Defendant Advantia Health Indian Creek ASC, 12240 Indian Creek Court, Suite 130, Beltsville, MD 20705, is an ambulatory surgical center. The Maryland Department of Assessments and Taxation lists Advantia Surgical, LLC as the owner of this company. It also provides an address for Advantia Surgical, LLC of 1367 Connecticut Avenue, NW, Suite 400, Washington, DC, which is the former address for both GBS Health, LLC and GBS Holdings, LLC.

24.    Defendant Natol Solutions, LLC of 9841 Avenel Farm Drive, Potomac, MD 20854, is the entity through which Defendant Dr. Bradford Kleinman charges for certain lab tests.

25.    Defendant Dr. Nancy Behram, 1400 Forest Glen Road, Silver Spring, MD 20910, was a partner in OB-GYN Associates and now works for Maryland Physicians Edge, P.C.

26.    Defendant Dr. Peter Glass, 251 18th Street, Arlington, VA 22202, is a major shareholder of GBS Holdings, LLC and a managing partner. According to its articles of

incorporation, Maryland Physicians Edge, P.C. is now owned by Dr. Glass. While Dr. Glass is a physician, he is not an obstetrician or gynecologist and is not licensed to perform the duties associated with such a practice. He no longer actively practices medicine. He became licensed in Maryland as a physician as a business decision to facilitate the purchase of OB-GYN Associates.

27.    Defendant Sean Glass, 251 18th Street, Arlington, VA 22202, is a major shareholder of GBS Holdings, LLC and CEO of that company.

28.    Defendant Dr. Ron Jacobs, 2010 Medical Park Drive, #201, Silver Spring, MD 20902, was a partner in OB-BYN Associates, but is no longer involved with his former partners.

29.    Defendant Dr. Bradford Kleinman, 1400 Forest Glen Road, Silver Spring, MD 20910, was a partner in OB-GYN Associates and now works for Maryland Physicians Edge, P.C. Dr. Kleinman also owns or controls Natol Solutions, LLC.

30.    Defendant Dr. Carolyn Morales, 1400 Forest Glen Road, Silver Spring, MD 20910, was a partner in OB-GYN Associates and now works for Maryland Physicians Edge, P.C.

**II.    FACTUAL ALLEGATIONS**

**A.    Summary of Allegations**

31.    The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

32.    Defendants Sean Glass and Dr. Peter Glass, acting as the lead investors, decided to buy OB-GYN Associates despite learning that the practice routinely violated the Stark Law's provisions against self-referral, failed to document the medical necessity of procedures charged to government programs, and committed other violations of law and CMS regulations.

33.     Defendants Dr. Peter Glass and Sean Glass, acting through GBS Holdings, LLC bought OB-GYN Associates' non-medical assets through GBS Health, as well as the ambulatory surgical center owned by partners of OB-GYN Associates.

34.     OB-GYN Associates' medical assets were purchased by Maryland Physicians Edge, P.C. with funds provided by GBS Holdings via GBS Health.   These funds were provided through a "sweetheart" "loan" between the entities. This transaction was not arms length in nature, and was constructed by Marc Solomon, who serves as Chief Financial Officer for both GBS entities.

35.     GBS Holdings and Sean and Dr. Peter Glass made these investments on behalf of themselves and their investors, while knowing significant risks about which they should have informed their investors, including that OB-GYN Associates was paying doctors in violation of the Stark Law, 42 U.S.C. § 1395nn.

36.     The violations of the Stark Law, lack of documentation of medical necessity and other violations detailed herein continued after the sale of the practice.

37.     After learning of the above issues, Defendants GBS Health, GBS Holdings, Sean Glass and Dr. Peter Glass took steps to hide the facts, both from appropriate legal authority and from their co-investors. They took steps to limit their own liability by changing the financial structure of their acquisition without informing their co-investors of the impact on their investment.

**B. Regulatory Framework**

**1. The False Claims Act**

38.     The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

39.     The False Claims Act prohibits the knowing presentment or submission of a false or fraudulent claim for payment or causing the submission of a false or fraudulent claim to the government. 31 U.S.C. § 3729(a)(1)(A).

40.     The False Claims Act provides that any person who knowingly presents or causes another to present a false or fraudulent claim to the Government for payment or approval is liable for a civil penalty of up to Eleven Thousand Dollars ($11,000) for each such claim, plus three times the amount of the damages sustained by the government.   31 U.S.C. §§ 3729(a)(1), (2).

41.     The so called *qui tam* provisions of the False Claims Act provide authority for private persons who have information regarding a false or fraudulent claim against the United States to bring an action on behalf of the government and to share in any recovery.  Any person having information regarding a false or fraudulent claim may bring an action of behalf of the government, and is entitled to share in any recovery. 31 U.S.C. §§ 3730(b)(1), (d). The Complaint must be filed under seal without service on any defendant. 31 U.S.C. § 3730(b)(2).   The Complaint remains under seal while the government conducts an investigation of the allegations and determines whether to join the action. 31 U.S.C. §§ 3730(a), (b)(4).

**2. Medicare Program**

42.     The government, through its Medicare program, is one of the principal payers for medical services rendered by the Defendants.

43.     Medicare is a United States Government program primarily benefiting the elderly that was created by Congress in 1965 when it adopted Title XVIII of the Social Security Act. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a

federal agency, which sets standards and regulations for participation in the program. Medicare Part A primarily covers medical care for patients admitted to the hospital, while Medicare Part B primarily covers doctor visits and medical care provided on an outpatient basis.

44.   The Medicare program works by reimbursing health care providers for the cost of services and ancillary items at fixed rates. Reimbursements are made out of the Medicare Trust Fund. The Medicare Trust Fund is supposed to reimburse only for those services that were actually performed, were medically necessary for the health of the patient, and were ordered specifically by a physician, using appropriate medical judgment and acting in the best interest of the patient. The Medicare Trust Fund relies on representations of suppliers of Medicare services, reimbursable in whole or in part under Medicare, that the services billed by the providers are medically necessary for the patient, are actually performed as billed, and are compensable by Medicare.

45.   Medicare and other government healthcare programs require that the service be physically performed and billed accurately according to CMS policies and procedure codes. CMS requires health care providers' certifications that they complied with all laws and regulations governing the provision of health care services, including compliance with anti-kickback laws and regulations. These certifications are an absolute condition precedent to retaining the Medicare funds conditionally advanced by the government and a prerequisite to continued future participation in the Medicare program. Without such certification, Defendants are required to repay all Medicare payments previously received.

### 3. Medicaid Program

46.   Medicaid was created in 1965 under Title XIX of the Social Security Act. Funding for Medicaid is shared between the United States Government and those states participating in the program. Under Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, federal money is distributed to the states, which in turn provide certain medical services to qualifying individuals.

47.   Although Medicaid is administered by the states, the state programs must adhere to federal guidelines. Federal statutes and regulations restrict the testing, procedures and durable medical equipment that the United States Government will pay for through its funding of the state Medicaid programs.

48.   Federal Medicaid regulations require that states designate a single state agency to oversee the Medicaid program. The agency must submit a plan that is consistent with Title XIX and with the regulations of the Secretary of Health and Human Services ("the Secretary"). After the Secretary approves the plan submitted by the state, each state is reimbursed quarterly for a percentage of the expenditures associated with providing specific types of medical assistance under the plan.

49.   Individuals may be dually eligible for both the Medicare program (as primary insurer) and the Medicaid program (as secondary insurer).

### 4. Other Federally-Funded Health Care Programs

50.   In addition to Medicare and Medicaid, the United States Government reimburses health care services and equipment under several other federal health care programs, including but not limited to TRICARE, CHAMPVA, the Federal Employees Health Benefit Program, and federal workers' compensation programs.

51.   TRICARE, administered by the United States Department of Defense, is a health care program for individuals and dependents affiliated with the United States armed forces.

52.   CHAMPVA, administered by the United States Department of Veterans Affairs, is a health care program for veterans with 100-percent service-connected disabilities and their eligible family members.

53.   The Federal Employee Health Benefits Program, administered by the United States Office of Personnel Management, provides health insurance for federal employees and their qualifying dependents, and retirees and surviving spouses.

**5. Stark Law - The Medicare/Medicaid Self-Referral Statute**

54.   The Medicare-Medicaid Self-Referral Statute, 42 U.S.C. § 1395nn *et seq.*, known as the "Stark Law," prohibits paying remuneration to physicians for referring patients to a provider where the referring physician has a nonexempt "financial relationship" with the provider.  42 U.S.C. §§ 1395nn(a)(1), (h)(6). The Stark Law also prohibits payment of Medicaid claims rendered in violation of its provisions.  42 U.S.C. §§ 1395nn(a)(1), (g)(1).

**B. Background on Initial Acquisition of OB-GYN Associates**

55.   The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

56.   In October of 2013, officers of GBS Holdings, including Dr. Peter Glass and Sean Glass, met with partners of OB-GYN Associates in order to discuss acquiring the medical practice and the doctors' ambulatory surgical center.

57.   These initial conversations exposed some issues that complicated the sale.

58.   OB-GYN Associates was controlled by Doctors Behram, Kleinman, and Morales, who were in the process of forcing their partner, Doctor Ron Jacobs, out of the practice.

59.   In addition, there was a competing offer for the practice.

60.   Both offers were pre-due diligence and only dependent on a "first look" at the business without further research.

61.   Defendant GBS Holdings decided to outbid the other entity in order to acquire the practice.

62.   The Letter of Intent that GBS Holdings provided to OB-GYN Associates was not signed by Doctors Behram, Kleinman and Morales until January of 2014. At that point, it was executed and agreed upon that GBS Holdings would pursue a stock purchase of OB-GYN Associates.

63.   GBS Holdings initially decided to pursue a stock purchase of OB-GYN Associates to maintain the continuity of business operations, and to preserve valuable insurance contracts.

64.   At this point GBS Holdings had no other insurance contracts, no infrastructure to run a medical practice, and did not have the staff or support to take over the business without OB-GYN continuing its operations.

65.   Defendants GBS Holdings, Sean Glass and Dr. Glass understood that by pursuing a stock purchase they would take on pre-existing liability, but also would be able to run the business seamlessly.

66.   Prior to the acquisition, GBS Holdings was clearly informed by insurance carriers, that an asset purchase, as opposed to a stock purchase, would mean the entire business would need to be restructured, new insurance contracts would need to be negotiated, physicians

would need to be re-credentialed, and GBS Holdings itself would need to hire more staff to take on the additional work. The financial implications of this were made clear to GBS Holdings prior to the acquisition of any OB-GYN Associates' assets.

67.   GBS Holdings decided to purchase the stock of OB-GYN Associates and executed a Letter of Intent stating its goal. However, when confronted with the fraudulent activity of OB-GYN Associates (including that committed by Doctors Behram, Jacobs, Kleinman and Morales), GBS Holdings decided to change the structure of the deal without advising investors of the cost or of the underlying reasons for its actions.

**C. The Investors learn about OB-GYN Associates violations**

68.   The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

69.   GBS officers, including Sean and Dr. Peter Glass, learned of the scope of the illegal practices by OB-GYN Associates and Doctors Behram, Jacobs, Kleinman and Morales during their review of the practice as part of the effort to purchase OB-GYN Associates.

70.   They learned the four doctors (Defendants Behram, Jacobs, Kleinman and Morales) referred business to their own ambulatory surgical center and ordered lab reports for their own lab, under which the physicians were directly paid a commission on such orders.

71.   Fees paid to the OB-GYN Associates' doctors were in violation of the Stark Law, because the payments were directly related to the volume of referrals for procedures and thereby violated the safe harbor for group practices.

72.   The relevant Stark Law provision states:

> A physician in the group practice may be paid a share of overall profits of the group, provided that the share is not determined in any manner that is directly related to the volume or value of referrals of DHS by the physician.

42 U.S.C. § 411.352(i)(1).

73.   The OB-GYN Associates' doctors referred lab work "in house," including urodynamic testing, dexascans and sonograms.

74.   The four doctors (Defendants Behram, Jacobs, Kleinman and Morales) who had been partners in the practice, also received 45 cents of every dollar spent at the Ambulatory Surgical Center ("ASC") for their own referrals, a cut of any referrals from the doctors who worked for them at OB-GYN Associates from the laboratory and the ASC's revenue.

75.   The non-partner physicians received 40 cents commission on every dollar spent as referrals to the ASC and the laboratory.  Any additional revenue was also divided among the partners.

76.   The incentive system and payments violate the Stark law.  The urodynamic testing, sonogram, and dexascan procedures are not considered to be incident to the personal services provided by the Doctors as required to qualify for a safe harbor exemption under the Stark Law 42 C.F.R. § 411.352.(i)(2)(iii).

77.   The self-referral violations became even more apparent to the Plaintiff-Relator after the initial takeover of the medical practice.

78.   The formula used to determine pay for the doctors working at OB-GYN Associates reflects that the doctors were paid bonuses based on the amount of referrals for additional services they made to the organization.

79.   For example, Dr. Kleinman was paid allocations from the amount the organization collected as a result of his patients and referrals for lab, testing and health procedures as well as ASC charges of patients he referred. Dr. Kleinman received a direct 45% of fees

paid by patients for sonograms, dexascans, urodynamic testing and referrals as well as a cut of other doctors' referrals to his own Ambulatory Surgical Center and laboratory.

80.  Since the partners of OB-GYN Associates owned the Ambulatory Surgical Center and the laboratory, a qualifying financial relationship existed that implicated the Stark Law.

81.  Further, the urodynamic testing equipment was individually owned by Defendant Dr. Kleinman through his company Natol Solutions, LLC.

82.  Dr. Kleinman was paid additional funds every time a test was performed via the outside company's test administrator, without the knowledge of his partners in OB-GYN Associates. He therefore, personally received an extra illegal kickback for each individual test, on top of the illegal kickbacks paid to himself and other defendants.

83.  Compounding these Stark Law violations the financial relationship between OB-GYN Associates and the laboratory, was not disclosed to patients.

84.  Nether was the ownership relationship between OB-GYN Associates and the ASC disclosed. This violates the following CMS coverage requirements:

> ***Standard: Disclosure of physician financial interest or ownership.*** The ASC must disclose, in accordance with Part 420 of this subchapter, and where applicable, provide a list of physicians who have financial interest or ownership in the ASC facility. Disclosure of information must be in writing.

42 C.F.R. § 416.50(b).

85.  Imaging equipment for dexascan and sonogram tests was owned by the OB-GYN Associates partners and OB-GYN Associates practice, and that was not disclosed to patients. Dr. Kleinman's ownership with respect to the urodynamic testing equipment was not disclosed to his partners or patients.

86.  OB-GYN Associates' contracts for anesthesia providers, sub-leases for additional office

space, and urodynamics testing also violated the Stark Law.

87. The Stark Law violations were not the only problem with billing at OB-GYN Associates.

88. The practice failed to document the medical necessity of the procedures it ordered.

89. Lack of documentation in Defendants' records makes it impossible for Defendants to establish the medical necessity of any medical procedure and therefore undermines the validity of claims that Defendants submitted to government insurance payments for such a procedure.

90. In addition, OB-GYN Associates consistently "up coded" bills in order to maximize revenue from the insurance company and patients.

91. As a result of these practices, Defendants OB-GYN Associates, and Doctors Behram, Jacobs, Kleinman and Morales, knowingly submitted false claims to Medicare, Medicaid, TRICARE, CHAMPVA, the Federal Employees Health Benefit Program and other government insurance programs.

**D. GBS Holdings Directors Cover Up Information And Continue Illegal Practices**

92. The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

93. After the GBS officers became aware of the violations set forth above, Dr. Peter Glass and Sean Glass determined that not only was this practice breaking the law, but also had millions of dollars of potential liability to the government.

94. Dr. Peter and Sean Glass were concerned about Stark Law and Anti-Kickback Statute violations, as well as improper billing and the physicians performing blood work, tests, and surgery that was not medically necessary.

95. They came to the conclusion that this activity was done to enrich the physicians personally. At this point they told the physicians their concerns, and told the physicians they needed to disclose these practices.

96. Doctors. Beharm, Kleinman and Morales refused to disclose any previous practices. Dr. Jacobs was not involved in these discussions.

97. At this point, Defendants Dr. Peter Glass and Sean Glass decided to continue with the acquisition, but to do so through an asset purchase in order to shield any tail liability to themselves and their investors.

98. Defendants Dr. Peter Glass and Sean Glass assured the physicians that they would clean this mess up and hide the past transgressions including false claims.

99. Toward this purpose Defendants Dr. Peter Glass and Sean Glass helped the physicians to secure a business practices liability tail insurance policy by concealing material facts about the practice's past wrongful acts, knowing full well that had the insurance company known the truth, it would have never underwritten the policy.

100. As a result, the Defendants knowingly concealed the false claims. Instead of disclosing the fraud and repaying the government for the false claims that had been submitted by Defendants, they avoided disclosure of these practices as well as the repayment of funds owed to the United States.

101. The people that Defendants Dr. Peter Glass and Sean Glass had convinced to invest in GBS Health and GBS Holdings were never directly informed of these additional costs.

102. Nor, of course, were investors advised as to the reasons underlying the change to the structure of the purchase, namely to hide the fraud and the submission of false claims to the government conducted by the practice.

103.   In addition to the knowing concealment of past practices, rather than cleaning up these practices following the takeover by GBS Health and GBS Holdings, the newly created entities have continued to commit Stark Law violations resulting in continuing violations of the False Claims Act.

## III.   FALSE CLAIMS ACT VIOLATIONS

### COUNT I
**False Claims Act – Presentation of False Claims**
**31 U.S.C. § 3729(a)(1)(A)**

104.   The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

105.   The Defendants violated the False Claims Act 31 U.S.C. § 3729 (a)(1)(A) by knowingly submitting false claims for payment to government entities for services in violation of numerous laws and government regulations.

106.   For example, the Defendants charged for government services in violation of the Stark Law by paying physicians through incentives, which were illegal, and not disclosing the financial relationship between the Ambulatory Surgical Center, the lab, testing equipment and the doctors as required.

107.   Dr. Kleinman also personally received money for urodynamics testing through a machine owned by his own company, Natol Solutions, LLC.

108.   Any violation of the Stark Law is also a violation punishable under the False Claims Act.

109.   The Defendants' failure to document the medical necessity of procedures means that they cannot demonstrate the medical necessity of procedures for which they charged the United States, which is a condition of payment under Medicare and other government

insurance programs, and thereby the Defendants knowingly submitted or caused false claims to be submitted.

110. In addition, the Defendants "up-coded" procedures to knowingly charge government programs more than the service they had provided.

111. Through the above practices the Defendants knowingly submitted or caused the submission of false claims to the United States and are liable for three times the amount of damages created by such false claims made to the United States.

112. Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of Five Thousand, Five Hundred Dollars to Eleven Thousand Dollars ($5,500-$11,000), plus any increase as specified under the Federal Civil Penalties Adjustment Act of 1990.

**COUNT II**
**False Claims Act – Making or Using False**
**Record or Statement to Cause Claim to Be Paid**
**31 U.S.C. §  3729(a)(1)(B)**

113. The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

114. In knowingly submitting or causing to submit false claims to the United States the Defendants also relied upon false statements and created false records to conceal the fraud and false claims in violation of 31 U.S.C. § 3729 (a)(1)(B).

115. Through the above practices the Defendants are liable to the United States for three times the amounted of damages created by such false records and statements.

116. Each and every such violation is also subject to a civil fine under the False Claims Act of Five Thousand, Five Hundred Dollars to Eleven Thousand Dollars ($5,500-$11,000), plus any increase as specified under the Federal Civil Penalties Adjustment Act of 1990.

## COUNT III
### False Claims Act – Retaining Money Belonging to the Government and or Concealing an Obligation to the Government.
### 31 U.S.C. §§ 3729(a)(1)(D) and (G)

117.    The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

118.    All the Defendants became fully aware of the fact that the former OB-GYN Associates was acting to charge government programs in violation of law and regulations as detailed above by the time the practice was acquired by GBS.

119.    Rather than inform the government of such false charges and pay back any monies wrongfully obtained, the Defendants acted to conceal this information to as tightly controlled a group as possible, including changing the structure of their investment to hide these issues.

120.    In retaining payments that that they knew or should have known should have been returned to the United States the Defendants therefore also violated 31 U.S.C. §§ 3729 (a)(1)(D) and (G).

121.    Through the above practices the Defendants are liable to the United States for three times the amount of damages they created by failing to return the property of the United States and/or concealing the obligations owed to the United States.

Each and every such violation is also subject to a civil fine under the False Claims Act of Five Thousand, Five Hundred Dollars to Eleven Thousand Dollars ($5,500-$11,000), plus any increase as specified under the Federal Civil Penalties Adjustment Act of 1990.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Relator, on behalf of himself, and the United States requests that judgment be entered in his favor and against Defendants as follows:

(a) That Defendants cease and desist from violating the False Claims Act 31 U.S.C. § 3729, *et seq.*

(b) That this Court enter judgment against all Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729 plus any increase as specified under the Federal Civil Penalties Adjustment Act of 1990;

(c) That Plaintiff-Relator be awarded a "relator's share" in an amount that the Court decides is reasonable, which shall not be less than 15% nor more than 30% of the proceeds or settlement of any related administrative, criminal, or civil actions, including the monetary value of any equitable relief, fines, restitution, or disgorgement to the United States, and/or third parties;

(d) That Plaintiff-Relator be granted a trial by jury;

(e) That Plaintiff-Relator, and the United States be awarded pre-judgment interest;

(f) That the Plaintiff-Relator be awarded all costs of this action including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d);

(g) The Court grant such injunctive and declaratory relief as may be proper; and

(h) The Court order such other relief as the Court deems just and proper.

### JURY TRIAL DEMANDED

Respectfully submitted,

PRICE BENOWITZ, LLP

David Benowitz
Bar #17672
409 7th Street NW
Washington, DC 2004
Email: David@Pricebenowitz.com
Phone: 202-417-6000
Fax:    2020-664-1331

Anthony C. Munter
409 7th Street NW
Washington, DC 2004
Email: Tony@Pricebenowitz.com
Phone: 202-417-6000
Fax:    2020-664-1331
*To be admitted pro hac vice*

and

KOHN, KOHN & COLAPINTO, LLP


David K. Colapinto
3233 P Street, N.W.
Washington, D.C.  20007-2756
Email:  dc@kkc.com
Phone:  202-342-6980
Fax:     202-342-6984
*To be admitted pro hac vice*

Attorneys for Plaintiff-Relator

March 25, 2016

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this ᵗ ᵏth day of March, 2016, I caused a true and correct copy of the Complaint to the Civil-Process Clerk, United States Attorney's Office for the District of Maryland, 36 South Charles Street Baltimore, MD 21201 and the Attorney General for the United States, 950 Pennsylvania Avenue, Washington DC 20530.

David Benowitz
*Counsel for Plaintiff-Relator*
*Christopher Berlin*
Bar #17672
Price Benowitz, LLP
409 Seventh Street, Suite 200
Washington, DC  20004
(202) 417-6000
david@pricebenowitz.com